**PROJECT VOTE/VOTING FOR AMERICA, INC., Plaintiff,**

v.

**Elisa LONG, in her Official Capacity as General Registrar of Norfolk, Virginia, and Nancy Rodrigues, in her Official Capacity as Secretary, State Board of Elections, Defendants.**

Civil No. 2:10cv75.

United States District Court,
E.D. Virginia,
Norfolk Division.

Oct. 29, 2010.

Augustine Martin Ripa, Jason Gassan Idilbi, Ryan Morland Malone, David O. Stewart, Douglas Harry Hallward–Driemeier, Ropes & Gray LLP, Bradley E. Heard, Advancement Project, Yolanda Sheffield, Project Vote for America, Inc., Washington, DC, for Plaintiff.

Jeff Wayne Rosen, Pender & Coward PC, Virginia Beach, VA, Stephen Michael Hall, Office of the Attorney General, Richmond, VA, for Defendants.

## OPINION

REBECCA BEACH SMITH, District Judge.

On February 16, 2010, the plaintiff, Project Vote/Voting For America, Inc. ("Project Vote"), filed a Complaint for Declaratory and Injunctive Relief ("Complaint") against the defendants, Elisa Long ("Long") and Nancy Rodrigues ("Rodrigues"). On March 26, 2010, the defendants filed a Motion to Dismiss the Complaint ("Motion"), pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6). On April 9, 2010, the plaintiff responded ("Response"), and the defendants replied ("Reply") on April 15, 2010. The Motion is now ripe for review.

## I. Factual Background

Project Vote is a nonprofit 501(c)(3) organization existing under the laws of Louisiana and having its principal office in the District of Columbia. (Compl. ¶ 4); see 26 U.S.C. § 501(c)(3). It endeavors to increase voter registration and participation among low-income, minority, and younger voters, while "working to enforce and expand public policies and procedures that encourage full participation in elections." (Compl. ¶ 4.) Defendant Elisa Long is the General Registrar of Norfolk, Virginia, and is responsible for

accepting and processing voter registration applications and requests for transfer or change of address; maintaining the official registration records for Norfolk, Virginia; preserving the written applications of all persons who are registered; and maintaining accurate and current registration records and complying with the applicable requirements for the transfer, inactivation, and cancellation of voter registrations.

(*Id.* ¶ 5 (citing Va.Code Ann. § 24.2–114(6), (8), and (12)).) Defendant Nancy Rodrigues, as Secretary of the Virginia State Board of Elections, is responsible for overseeing the duties of the State Board of Elections, which supervises the city electoral boards and registrars in conducting elections, and creates rules, regulations, and instructions designed to bring local electoral boards in compliance with elections laws. (*Id.* ¶ 6 (citing Va.Code Ann. §§ 24.2–103 and 404.1).) Rodrigues is also responsible for the administration of the Commonwealth's responsibilities under the National Voter Registration Act ("NVRA"), 42 U.S.C. § 1973gg *et seq.* (Compl. ¶ 6.)

Through its ongoing voter protection efforts in Virginia, Project Vote learned that several students at Norfolk State University, a historically African–American public university located in Norfolk, Virginia, had their voter registration applications rejected by Long's office prior to the November 2008, primary and general elections. (*Id.* ¶ 14.) Suspicious that these students' applications were incorrectly rejected by the

Norfolk General Registrar and that eligible voters may have been prevented or discouraged from voting in the 2008 general election, Advancement Project, a national civil and voting rights organization with which Project Vote works, wrote an email request to Long on May 11, 2009, pursuant to 42 U.S.C. § 1973gg–6(i) (hereinafter referred to as the "Public Disclosure Provision"),[1] to

'make available for inspection and copying the completed voter registration applications of any individual who timely submitted an application at any time from January 1, 2008, through October 31, 2008, who was not registered to vote in time for the November 4, 2008 general election,' and also other documents, 'such as documents identifying the reasons the applications were rejected.'

(Compl. ¶ 15.) On May 13, 2009, Long responded to the email stating that she would not permit inspection or copying of these records (collectively referred to as the "Requested Records"),[2] pursuant to Va.Code § 24.2–444, which purportedly forbids disclosure of the Requested Records.[3] (Compl. ¶ 17.) On that same date,

---

1. This provision reads in pertinent part:

Each State shall maintain for at least 2 years and shall *make available for public inspection* and, where available, photocopying at a reasonable cost, *all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters,* except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

42 U.S.C. § 1973gg–6(i)(1) (emphasis added).

2. The plaintiff contends that without access to these records, it cannot determine whether the applications were lawfully rejected or whether "systemic election administration problems with the Norfolk General Registrar's Office exist," so as to correct those problems prior to the 2010 federal midterm elections. (Compl. at 2–3.)

3. Virginia Code § 24.2–444 is entitled "Duties of general registrars and State Board of Elections as to voter registration records; public inspection; exceptions." Subsection A of this provision addresses the requirement of the general registrar to make lists of registered voters and lists of persons denied registration and specifically requires that "the lists shall be opened to public inspection at the office of the general registrar when the office is open for business." Va.Code § 24.2–444(A). Subsection B parrots the language of 42 U.S.C. § 1973gg–6(i), and makes available for public inspection and copying records "concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of the registration records," pursuant to other sections of the state code. Va.Code § 24.2–444(B). Subsection C states that none of the documents provided under subsections A and B should be made available, if they contain: 1) an individual's social security number ("SSN"); 2) an indi-

Martha Brisette, an attorney and policy analyst with the Virginia State Board of Elections, sent Advancement Project an email agreeing with Long's decision. (*Id.* ¶ 18.)

On May 15, 2009, representatives from Advancement Project and Project Vote traveled to Long's Norfolk office, again seeking access to the Requested Records, and were again denied such access. (*Id.* ¶ 19.) On June 22, 2009, Advancement Project and Project Vote wrote to Rodrigues, purportedly pursuant to NVRA § 11(b), 42 U.S.C. § 1973gg–9(b), advising her that they believed Long's denial was in violation of the Public Disclosure Provision of the NVRA. (Compl. ¶ 20.) Advancement Project and Project Vote requested that Rodrigues

> issue a written directive to all General Registrars and state election officials advising them of their obligation under the NVRA to permit inspection and copying of 'all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters,' *including copies of completed voter registration applications.*

(*Id.*) (emphasis added).[4] On that same date, Martha Brisette responded to that request, stating that the State Board of Elections, at its July 10, 2009, meeting, had requested an informal opinion of the Attorney General of Virginia on this matter. (*Id.* ¶ 21.) On September 25, 2009, Ms. Brisette forwarded Advancement Project and Project Vote an informal opinion, dated September 23, 2009, from Stephanie Hamlett ("Hamlett Opinion"), Senior Counsel to the Attorney General. (*Id.*

¶ 22.) Ms. Hamlett concluded that " 'the completed voter registration application of any individual is not a part of the record of the implementation of programs and activities conducted for the purposes of ensuring the accuracy and currency of official lists of eligible voters covered by [the Public Disclosure Provision].' " (*Id.* (quoting Hamlett Opinion at 1).)

Accordingly, the plaintiff has filed the instant Complaint, alleging that the actions of the defendants are in violation of the NVRA's Public Disclosure Provision. Specifically, the plaintiff claims that the NVRA and the Public Disclosure Provision require that the Requested Records be available to the public for inspection because they are records " 'concerning the implementation of programs or activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters.' " (*Id.* ¶ 29 (quoting 42 U.S.C. § 1973gg–6(i)).) Additionally, to the extent that the Virginia statute limits the availability of the Requested Records to the public for inspection and photocopying, it is superseded by the NVRA, pursuant to the Supremacy Clause of the United States Constitution. Therefore, the plaintiff asks the court to 1) declare that the defendants are in violation of the NVRA; 2) declare that the NVRA preempts the Virginia statute, and any other Virginia law or regulation stating the same (hereinafter referred to as the "preemption claim"); 3) permanently enjoin the defendants' denial of access to the Requested Records; and 4) award Project Vote the costs incurred in pursuing this action, as authorized by 42 U.S.C. § 1973gg–9(c).

---

vidual's residence, if the individual furnished a post office box in lieu of residence; 3) the declination to register vote and related records; 4) the identity of a voter registration agency through which a voter was registered; or 5) the day and month of birth of an individual. *Id.* § 24.2–444(C).

4. The letter requested that the voter registration applications be redacted to exclude only the applicant's SSN and agency of registration, if applicable. (*See* Response, Ex. A.)

In the Motion, the defendants assert two grounds for dismissal of the Complaint. First, the defendants contend, pursuant to Federal Rule of Civil Procedure 12(b)(1), that this court does not have subject-matter jurisdiction in this case because the plaintiff does not have individual or representational standing to sue under the NVRA.[5] The defendants contend that the plaintiff has not suffered an "injury in fact" and, thus, cannot state a valid claim. Second, the defendants contend, pursuant to Federal Rule of Civil Procedure 12(b)(6), that the Requested Records are not records subject to the Public Disclosure Provision of the NVRA, and, thus, none of the plaintiff's claims are plausible. Moreover, they contend that the Virginia statute is, therefore, not in conflict with the NVRA, and the plaintiff's preemption claim, specifically, is implausible and must be dismissed. The court will address each ground, in turn, below.

## II. Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1)

The defendants contend that this court lacks subject matter jurisdiction because Project Vote's claim that potentially qualified Norfolk State University students were denied voter registration does not amount to an "injury-in-fact," which could support standing. (*See* Mem. in Supp. Of Motion at 7–9.) Instead, the defendants contend that such a claim only shows that Project Vote's "ideals and social policy interests" have been harmed, which are insufficient grounds for standing. (*Id.*) However, for the reasons detailed below, the court **FINDS** that the plaintiff has sufficiently alleged an informational injury, giving the plaintiff standing in this case. Therefore, the court **DENIES** the defendants' Motion to Dismiss for lack of standing.

## A. General Standard of Review

"Standing is a threshold jurisdictional question which ensures that a suit is a case or controversy appropriate for the exercise of the courts' judicial powers under the Constitution of the United States." *Pye v. United States*, 269 F.3d 459, 466 (4th Cir. 2001). A defendant may question a plaintiff's standing by either asserting that the complaint fails to allege sufficient facts to show it has standing or, that factual allegations cited by the plaintiff in support of standing are untrue. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982). In the former case, the court must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party. In the latter case, the court may go beyond the allegations of the complaint and make factual findings as to whether the plaintiff has standing. *Id.* Nevertheless, the burden is on a plaintiff invoking federal subject-matter jurisdiction to allege, and ultimately prove, standing, namely that 1) the plaintiff suffered an actual or threatened injury, 2) there is a causal connection between the defendant's conduct and the injury, and 3) the injury will be redressed by a favorable decision. *See, e.g., Miller v. Brown*, 462 F.3d 312, 316 (4th Cir.2006).

With regard to the injury prong, "[t]he actual or threatened injury required [for standing] may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Accordingly, an organizational plaintiff, just like an individual plaintiff, may bring suit based on injuries suffered by the organization itself, in order "to vindicate whatever rights and immunities the association itself may enjoy." *Id.*

---

**5.** The court notes that the plaintiff does not rely on representative standing and offers no proof of such standing. Thus, the court need not address that issue.

at 511, 95 S.Ct. 2197. However, "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." *Id.* at 500, 95 S.Ct. 2197. Specifically, where the merits of a case involve a question of statutory construction, the " 'district court has jurisdiction if the right of the [plaintiffs] to recover under their complaint will be sustained if the [applicable laws] are given one construction and will be defeated if they are given another.' " *Pitt County v. Hotels.com,* 553 F.3d 308, 312 (4th Cir.2009) (quoting *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)); *cf. Adams,* 697 F.2d at 1220 (holding that where factual disputes relating to standing were "so intertwined with the facts upon which the ultimate issues on the merits must be resolved, that 12(b)(1) is an inappropriate basis upon which to ground the dismissal.").

### B. Standing Analysis

■ The defendants' standing argument both mischaracterizes the nature of the injury which the plaintiff claims and misapprehends the burden which the plaintiff must meet to sufficiently · allege such an injury at this stage of the litigation. Contrary to the defendants' characterization of plaintiff's claimed injury, Project Vote does not claim that it was harmed by the rejection of potentially qualified voter-applicants. Instead, the plaintiff claims that the defendants' refusal to allow *access to the Requested Records,* to which Project Vote was purportedly entitled under the NVRA, was a direct informational injury to Project Vote.[6] (*See* Response at 10.)

■ For a plaintiff to sufficiently allege an informational injury, it must first allege that the statute confers upon it an individual right to information, and then that the defendant caused a concrete injury to the plaintiff in violation of that right. *See Salt Inst. v. Leavitt,* 440 F.3d 156, 159 (4th Cir.2006) (recognizing that standing based on an informational injury requires a two-fold inquiry into 1) the status of the claimed right, i.e., whether the plaintiff has any right to information, and 2) the concreteness of the alleged injury). For example, in *Public Citizen v. United States Department of Justice,* 491 U.S. 440, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989), the plaintiff sought records from the American Bar Association's Standing Committee on the Federal Judiciary ("ABA Committee"), pursuant to the Federal Advisory Committee Act ("FACA"), 5 U.S.C.App. § 1 *et seq.* The Supreme Court held that FACA created a public right to information by requiring advisory committees to the executive branch of the federal government *to make available to the public* its minutes and records, · with some exceptions. 491 U.S. at 446–47, 109 S.Ct. 2558. Moreover, because the plaintiff alleged that the de-

---

**6.** The focus of the plaintiff's claim is the denial of access to the Requested Records by the defendants. The plaintiff's reference to the *potentially unlawful rejection of qualified* applicants highlights the reason for seeking the Requested Records, and informs the way in which the plaintiff believes the NVRA should be construed. The plaintiff contends that because the NVRA's purpose is to encourage voter registration and eliminate unlawful impediments to a citizens' right to vote, the court should construe the terms of the statute, particularly the Public Disclosure Provision, in a manner that will allow a thorough inves-

tigation into circumstances where potential voters may have been denied their right to vote without proper, lawful consideration. In any event, the plaintiff's particular motivation in seeking the Requested Records is irrelevant to whether it has suffered an injury in fact for standing purposes. *Cf. EPA v. Mink,* 410 U.S. 73, 86, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973) (holding that the particularized need of the individual seeking information under FOIA, a statute which grants to the public the right to information, was irrelevant for standing purposes).

fendant denied it that right, the Court rejected the defendant's contention that the plaintiff had not alleged an "injury sufficiently concrete and specific to confer standing." *Id.* at 448, 109 S.Ct. 2558. Instead, the Court held that "refusal to permit [the plaintiff] to scrutinize the ABA Committee's activities to the extent FACA allows constitutes a sufficiently distinct injury to provide standing to sue." Therefore, the plaintiff "need show [no] more than that they sought and were denied specific agency records." *Id.* at 449, 109 S.Ct. 2558.

The Court reaffirmed the holding of *Public Citizen* in *Federal Election Commission v. Akins,* 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998). In this latter case, the FEC determined that the American Israel Public Affairs Committee ("AIPAC") was not a "political committee" as defined by the Federal Election Campaign Act ("FECA"), 2 U.S.C. § 431 *et seq.,* and, thus, was not required to make public disclosures regarding its membership, contributions, and expenditures as FECA required of "political committees." Again, the Court acknowledged that FECA, like the statute at issue in *Public Citizen,* created a public right to information. 524 U.S. at 14–15, 118 S.Ct. 1777. Moreover, the Court again rejected the defendant's contention that the plaintiffs failed to allege an "injury in fact," and held that "[t]he 'injury in fact' that [the plaintiffs] have suffered consists of their inability to obtain information ... that, on [their] view of the law, the statute requires that AIPAC make public." *Id.* at 21, 118 S.Ct. 1777. The Court reiterated that in *Public Citizen* it previously held that "when the plaintiff fails to obtain information *which must be publicly disclosed pursuant to a statute,*" the plaintiff does suffer an injury in fact. 524 U.S. at 21, 118 S.Ct. 1777 (emphasis added);[7] *cf. Salt Inst. v. Leavitt,* 440 F.3d 156, 159 (4th Cir.2006) (finding that a plaintiff did not have standing to sue under the Information Quality Act because that statute did not create any right to information).

In this case at bar, as in *Public Citizen* and *Akins,* the NVRA provides a public right to information.[8] There is no dispute that the plaintiff has been unable to obtain the Requested Records, which, in its view of the law, the NVRA requires the defendants to make publicly available. Moreover, the NVRA specifically provides a private right of action to any person who is aggrieved by a violation of the Public Disclosure Provision. *See* 42 U.S.C. § 1973gg–9(b)(1). Therefore, the plaintiff's alleged informational injury is sufficient to survive a motion to dismiss for

7. The Court in *Akins* also rejected the defendant's contention that the plaintiffs' alleged injury was too much of a "generalized grievance" as it was "one which is shared in substantially equal measure by all or a large class of citizens." 524 U.S. at 23, 118 S.Ct. 1777. The Court noted that the "generalized grievance" limitation on standing applied to cases where the plaintiff's alleged injury was "of an abstract and indefinite nature" such as the "common concern for obedience to the law." *Id.* at 23–24, 118 S.Ct. 1777. The Court continued by noting that, like other cases where the number of persons have a shared injury, for example a mass tort case or a case where a large number of voters suffer interference with voter rights, the mere fact

that an injury is widely shared does not, in and of itself, remove the plaintiff's standing in federal court. *Id.* at 24, 118 S.Ct. 1777.

8. *See supra* note 1. Both the FACA and FECA have similar public disclosure provisions. *See* FACA, 5 U.S.C.App. 2 § 10(b) ("[T]he records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection."); FECA, 2 U.S.C. § 434(a)(11)(B) ("The Commission shall make a designation, statement, report, or notification that is filed with the Commission under this Act available for inspection by the public").

lack of standing. However, the defendants still contend that the plaintiff does not have standing because the plaintiff is not entitled to the Requested Records. (*See* Reply at 2–4.) In other words, the defendants contend that even if the plaintiff has a right to information under the NVRA, it has no right to the particular information it seeks under the NVRA. Such a contention "improperly conflate[s] the threshold standing inquiry with the merits" of the plaintiff's claim, *Pitt County*, 553 F.3d at 312, and it is in this regard that the defendants misapprehend the plaintiff's burden at this stage in the litigation.

In *Pitt County*, the Fourth Circuit reversed a district court's dismissal of the county's claim on the ground that it lacked standing because the district court ultimately concluded that the statute on which the county relied did not afford the county relief. *Id.* The Fourth Circuit held that the fact that the "district court ultimately disagreed with the County regarding the [construction of the statute] does not mean that the County failed to allege an injury in fact. To hold otherwise would reduce all merits inquiries in cases of this type into standing inquiries." *Id.* In this case, Project Vote need not prove, for standing purposes, that it has a right to the Requested Records, because this determination depends upon the court's ultimate construction of the statute at issue. *See id.* at 312 (recognizing that a plaintiff " 'need not prove the merits of [its] case in order to demonstrate that it ha[s] Article III Standing.' " (quoting *Am. Library Ass'n v. FCC*, 401 F.3d 489, 493 (D.C.Cir.2005))); *see also Akins*, 524 U.S. at 21, 118 S.Ct. 1777 (holding that whether a plaintiff has alleged an injury-in-fact depends upon whether the plaintiff is unable to obtain information which, in the plaintiff's view of the law, creates the right to access that information). Accordingly, the court DE-

NIES the defendants' Motion to Dismiss the Complaint for lack of standing.

### III. Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(6)

The defendants claim that Project Vote is not entitled to the Requested Records and, thus, Project Vote has not stated a plausible claim for declaratory and injunctive relief. For the reasons detailed below, the court **FINDS** that the Public Disclosure Provision grants the plaintiff certain access to the Requested Records and, thus, the plaintiff has stated plausible grounds for declaratory and injunctive relief.[9] Therefore, the court **DENIES** the defendants' Motion to Dismiss for failure to state a claim.

### A. General Standard of Review

When ruling on a motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), the court accepts the facts alleged in the Complaint as true and views them in the light most favorable to the plaintiff. *Advanced Health–Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 143 (4th Cir.1990). However, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). Accordingly, the plaintiff must allege facts that show more than a "sheer possibility" or "mere[ ] consist[ency]" with unlawful conduct, but must instead show that the plaintiff is

---

**9.** The extent of the access remains to be determined.

entitled to relief. *Id.* (citing *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955).

To resolve whether plaintiff has stated a claim upon which relief may be granted, the court must decide whether the Requested Records, namely voter registration applications, are "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 42 U.S.C. § 1973gg–6(i)(1). Accordingly, the court must first determine what constitutes a program or activity conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters. The court then applies that standard to determine whether voter registration records, specifically voter registration applications, concern the implementation of such a program or activity.[10] To do so, the court examines the plain meaning of the Public Disclosure Provision.

### B. Plain Meaning Analysis

 In construing a statute, the court applies the plain meaning of the statutory language, unless there is a clearly expressed legislative intent to the contrary, or "when a literal application would frustrate the statute's purpose or lead to an absurd result." *Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Allen,* 152 F.3d 283, 288 (4th Cir.1998). Where the statutory language has a plain meaning, the court's inquiry is complete and it will enforce the statute as written. *Stephens ex rel. R.E. v. Astrue,* 565 F.3d 131, 137, 140 (4th Cir.2009). A statute's

plain meaning is defined by the statutory language's common and ordinary meaning, absent an indication from Congress that the language should have a different meaning, *id.* at 137, and by both the specific context in which the language is used and in the broader context of the statute as a whole. *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997).[11]

The defendants insist that the Public Disclosure Provision only "mandates public access to records that prove the states are properly maintaining lists of registered voters," and, thus, does not "cover the registration applications of people who never enter these lists." (*See* Mem. in Supp. of Motion at 11, 13.) In other words, they contend that, under a plain meaning analysis, only programs and activities which facilitate the proper removal of already-registered voters from the voter rolls, or which allow updating the information of already-registered voters on the voter rolls, or both, are contemplated by the Public Disclosure Provision as programs and activities that ensure the "accuracy and currency of official lists of eligible voters." (*Id.*) Thus, only records related to those procedures, which would clearly not include voter registration applications, must be disclosed for public inspection. The court cannot agree with the defendants' construction of the Public Disclosure Provision, as it contradicts the statute's plain meaning.

### 1. Common and Ordinary Meaning

██ At a threshold level, the court must determine whether voter registration ap-

---

10. This issue appears to be one of first impression, as the court has found no federal case law, and the parties have presented none, construing this section of the NVRA in the manner that it must be construed in this case. While the plaintiff cites *Jenkins v. Ousse,* 145 F.3d 359 (5th Cir.1998), upon the court's review of that case, that opinion did not address the issues presented in this case.

11. Alternatively, where statutory language is ambiguous, and thus lacking a plain meaning, the court will look to a statute's legislative history to determine the intent of Congress. *See, e.g., Stiltner v. Beretta U.S.A. Corp.,* 74 F.3d 1473, 1482 (4th Cir.1996).

plications are "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 42 U.S.C. § 1973gg–6(i)(1). To do so, as stated above, the court looks to the common and ordinary meaning of this statutory language. The term "eligible" refers to one that is "qualified to be chosen" or "entitled to something." *Webster's Third New International Dictionary* 736 (2002).[12] The term "current" refers to something that is "occurring in or belonging to the present time" or is "most recent," *id.* at 557, while the term "accurate" refers to something "free from error ... esp[ecially] as the result of care" or "in exact conformity to truth or to some standard." *Id.* at 14. Accordingly, a program or activity covered by the Public Disclosure Provision is one conducted to ensure that the state is keeping a "most recent" and errorless account of which persons are qualified or entitled to vote within the state.

The process by which the Commonwealth determines whether a person is eligible to vote certainly falls within the purview of the federal statute, as such a process, by its very nature, is designed to ensure that the Commonwealth's lists are current and accurate. The process of evaluating voter registration applications, which determines whether a person belongs on the voter rolls, is a central part of "ensuring the accuracy and currency of the official lists of eligible voters." 42 U.S.C. § 1973gg–6(i)(1).[13] Similarly, the establishment, and proper administration, of voter registration procedures, about which the NVRA seems primarily concerned, directly informs whether the lists of eligible voters are current and accurate. Simply put, "official lists of eligible voters" would be inaccurate and obsolete if eligible voters were improperly denied registration.[14]

Additionally, the exceptions to the Public Disclosure Provision provide evidence that it contemplates and covers voter reg-

---

**12.** *See, e.g., United States v. Groce,* 398 F.3d 679, 682 (4th Cir.2005) (finding the use of dictionary definitions authoritative when construing a statute's common and ordinary meaning). The dictionary definitions used in the text of this Opinion are from the most recent published *Webster's Third New International Dictionary* (2002). The court notes, however, that the 2002 definitions remain exactly the same, and are even on the same pages, as those in *Webster's Third New International Dictionary* (1966). Moreover, the court also consulted the 2010 online versions of *Merriam–Webster Dictionary* and of the *Oxford English Dictionary* to verify these definitions, which are all virtually identical with those used in the text.

**13.** This fact is made clearer by Virginia's Voter Registration application, which states that a person is not "officially registered to vote until this application is approved." (*See* Mem. in Supp. of Motion, Ex. D.) Accordingly, evaluation and approval of a voter registration application determines whether one is entitled to be on the lists of eligible voters, and, thus, whether the lists are accurate and current.

**14.** The defendants cite, at length, the NVRA sections having to do with removing voters, but never fully develop any cogent basis for concluding that the NVRA or the Public Disclosure Provision relates *exclusively* to those procedures. To the contrary, the defendants concede that the statute incorporates voter registration procedures *and* voter removal procedures. (*See* Mem. in Supp. of Motion at 16) ("Congress intended to provide public disclosure only for *records related to the procedures states use for voter registration* and the maintenance of voter rolls (particularly with regard to accurate removal from those rolls) ...." (emphasis added)). Notwithstanding this contradiction of their original position that the Public Disclosure Provision only refers to records related to procedures used for voter removal, the defendants perplexingly, and ultimately ineffectively, attempt to distinguish voter registration applications from other records related to voter registration procedures. As the statute requires disclosure of "all records" relating to voter registration procedures, *a fortiori* voter registration applications, which obviously so relate, must also be disclosed.

istration procedures, as the exceptions directly address records concerning such procedures. The Public Disclosure Provision provides that records which "relate to a declination to register to vote or the identity of a voter registration agency through which any particular voter is registered" are not subject to disclosure under the Public Disclosure Provision. 42 U.S.C. § 1973gg–6(i). The first exception refers to concealing records which relate to persons that decline to register, and the second exception refers to the confidentiality of records which relate to the agency through which a voter registered. It is clear that these records relate to voter registration procedures, demonstrating that the Public Disclosure Provision necessarily contemplates records relating to voter registration procedures. Accordingly, if the defendants' contention were true, the inclusion of those exceptions would be superfluous because it would mean that the exceptions refer to records that were never within the purview of the Public Disclosure Provision in the first place. However, "it is a classic canon of statutory construction that courts must give effect to every provision and word in a statute and avoid any interpretation that may render statutory terms meaningless or superfluous." *Discover Bank v. Vaden,* 396 F.3d 366, 370 (4th Cir.2005) (citation omitted).

The court also finds that, with respect to records which "concern" the "implementation" of voter registration procedures, a common and ordinary understanding of those terms encompasses voter registration applications. The term "concern" means "to relate or refer to," to "be about," or "to have an influence on." *Webster's Third New International Dictionary* 470 (2002).[15] The term "implementation" means the act of "carry[ing] out" or "accomplish[ing]" or "giv[ing] practical effect to and ensur[ing] ... actual fulfillment by concrete measures." *Id.* at 1134–35. Accordingly, records which relate to carrying out voter registration procedures are subject to the Public Disclosure Provision's requirements.

As stated above, voter registration procedures are the procedures by which the Commonwealth evaluates whether persons belong on the lists of eligible voters, thus ensuring the accuracy of those lists. A completed voter registration application is the means by which an individual provides the information necessary for the Commonwealth to determine his eligibility to vote. It is clear, then, that voter registration applications, perhaps more than other records, are relevant to carrying out voter registration procedures.[16] Moreover, the fact that the Public Disclosure Provision

---

**15.** *See supra* note 12.

**16.** Purportedly in support of its position that disclosure of voter registration applications is not contemplated by the Public Disclosure Provision, the defendants cite the FEC's guide to implementing the NVRA, published in 1994, which states that in light of the Fourth Circuit's opinion in *Greidinger v. Davis,* 988 F.2d 1344 (4th Cir.1993), states may want to further consider whether to allow original voter documents to be disclosed to the public. (*See* Mem. in Supp. of Motion, Ex. E) (hereinafter referred to and cited as the "FEC Guide"). However, the defendants' reliance on this document is erroneous for at least

three reasons. First, *Greidinger* does not support the defendants' position. In that case, the Fourth Circuit had no occasion to construe the NVRA. Moreover, that case concerned whether the plaintiff had a strong enough privacy interest *in his SSN* that the state's requirement that he agree to disclose it to the public as a prerequisite to voting was an unlawful infringement upon his right to vote. Not only is that not the issue here, but the resolution of that question does not determine whether the voter registration applications, themselves, would be subject to disclosure in redacted form. *See* discussion *infra* at 710–12. Second, the FEC did not conclude that *Greidinger* stood for the proposition that

very clearly requires that "all records" be disclosed brings voter registration applications within its reach. The records which Congress did not want to be encompassed by the term "all" were specifically identified in the exceptions to the Public Disclosure Provision, and voter registration applications do not fall within either of those exceptions. Therefore, the court will not undermine the purposeful usage of a broad term by Congress, in order to limit the scope of the statute. *See Students with Disabilities*, 152 F.3d at 290. Moreover, the court will not, uninvited by the Constitution or Congress, craft or infer additional exceptions. *Rosmer v. Pfizer*, 272 F.3d 243, 247 (4th Cir.2001).[17]

In sum, the court finds that the common and ordinary meaning of the terms of the Public Disclosure Provision encompass voter registration applications, as these records concern "the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 42 U.S.C. § 1973gg–6(i)(1).

### 2. Contextual Meaning

To determine the plain meaning of statutory language, the court also looks to the specific context in which the language is used and to the broader context of the statute as a whole. *Robinson*, 519 U.S. at 337, 117 S.Ct. 843. A contextual analysis of the Public Disclosure Provision supports the conclusion that the statute refers to voter registration procedures, and, thus, voter registration records, which obviously include voter registration applications.

In terms of the specific context, the defendants, despite acknowledging that the statute is concerned with states' voter registration procedures, contend that the Public Disclosure Provision "arises in the

---

voter registration applications were, in their entirety, confidential, nor did it conclude that the NVRA did not require disclosure of those documents. To the contrary, the FEC recognized that "voter registration documents are generally considered public documents," but suggested that states which require SSNs on the voter registration form "may want *to explore* [the issue of keeping SSNs confidential]" in light of *Greidinger*. (FEC Guide at 7– 5) (emphasis added). The conclusion that voter registration applications should be confidential does not follow from that suggestion. Third, even if the FEC had found *Greidinger* to mean that the NVRA did not allow disclosure of voter registration applications, or otherwise concluded that voter registrations should be kept confidential, neither the FEC's interpretation of the NVRA or of Fourth Circuit precedent, nor the FEC's opinion regarding the potential confidentiality of voter registration applications is binding upon the court. (*See* FEC Guide at P–1.)

**17.** Additionally, the court does not agree with the defendants' position that section gg–6(i)(2) identifies the only records which are subject to disclosure. That section states that "the records maintained pursuant to [the Public Disclosure Provision] shall include lists of the names and addresses of all persons to whom such notices [regarding removal of voters from the voter rolls under subsection (d)(2)] and information concerning whether or not each such person has responded to the notice...." 42 U.S.C. § 1973gg–6(i)(2). The defendants contend that because voter registration applications are not the "type" of records referred to in that section, then they are not subject to public disclosure. However, there is no indication in the statute that the use of the term "shall include" is meant to limit the term "all records." Instead, this language is not exhaustive and merely explains that those type of records, among others, are subject to disclosure. *See Nat'l Fed'n of the Blind v. F.T.C.*, 420 F.3d 331, 337–38 (4th Cir.2005) (holding that the term "shall include" was not exhaustive in light of the breadth of other statutory provisions). Moreover, the breadth of the term "all" used in the Public Disclosure Provision, as well as the significance of the exceptions included within that provision, confirm that section 6(i)(2) is not an exhaustive list of the records subject to disclosure. If the defendants' argument were true, the term "all" would be rendered meaningless and the exceptions would be superfluous, as they are not the "type" of records listed in subsection 6(i)(2).

context of the procedure for *removing* voters from registration lists." (Mem. in Supp. of Motion at 11) (emphasis in original).[18] However, this contention is not borne out in the statute. While there are a number of subsections in 42 U.S.C. § 1973gg that specifically address voter removal procedures, there are also subsections discussing voter registration procedures. Subsection 1973gg–6 is itself entitled "Requirements with respect to *administration of voter registration.*" 42 U.S.C. § 1973gg–6 (emphasis added). Importantly, subsection 1973gg–6(i), which contains the Public Disclosure Provision, is entitled "Public disclosure of *voter registration activities.*"[19] *Id.* § 1973gg–6(i) (emphasis added).

Another example is subsection 1973gg–6(a)(1), which requires that states "ensure that any eligible applicant is registered to vote in an election," if the voter registration application is properly and timely submitted. *Id.* § 1973gg–6(a)(1). This mandate demonstrates that whether a list of eligible voters is current and accurate directly implicates the propriety, or lack thereof, of voter registration procedures implemented by the state. Voter registration applications, therefore, directly concern the implementation of that mandate and related voter registration procedures. Moreover, the fact that there are subsections within 42 U.S.C. § 1973gg–6 dealing specifically and exclusively with voter removal procedures shows that where Congress wanted to draw specific attention to programs and activities designed to make lists of eligible voters accurate and current through voter removal procedures, it specifically did so. *See id.* § 1973gg–6(a)(4) (requiring that states "conduct a general program . . . to remove the names of ineli-

gible voters from the official lists of eligible voters . . ."); *id.* § 1973gg–6(c)(2)(A) (specifically referring to programs designed to "systematically remove the names of ineligible voters from the official lists of eligible voters"). Subsection 1973gg–6(i) is not one of those subsections where Congress paid exclusive attention to voter removal procedures.

With respect to the broader context of the statute, it is entitled "National Voter Registration." *Id.* § 1973gg *et seq.* Moreover, each of the substantive provisions in 42 U.S.C. § 1973gg, including subsection 6, discuss methods to promote increased voter registration, with some subsections providing added emphasis on voter registration programs to be conducted by the state. *See, e.g., id.* § 1973gg–4(b) (requiring mail voter registration forms be available for distribution through governmental and private entities, "with particular emphasis on making them available for organized voter registration programs"). Additionally, like subsection gg–6(i), many subsections include provisions which direct states not only to update voter information, *but also to put programs in place to increase voter registration efforts. See, e.g., id.* §§ 1973gg–3 (a)(1)-(2) and (d); *id.* § 1973gg–4(a)(1)–(3). There is ample support throughout the NVRA, therefore, for the conclusion that the Public Disclosure Provision is meant to cover records concerning the implementation of voter registration procedures, which by necessity include voter registration applications.

### 3. Statutory Purpose

Under a plain meaning analysis, the court will not apply a statute's plain meaning when it would frustrate the statute's purpose or lead to an absurd result. Such

---

**18.** *See supra* note 14.

**19.** While the court recognizes that a statute's title is not dispositive for interpretation purposes, it is helpful and instructive for this

contextual meaning analysis. *See I.N.S. v. Nat'l Center for Immigrants' Rights, Inc.,* 502 U.S. 183, 190, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991).

in not the case here. In this case, the NVRA's statutory purpose is plainly set out within the statute:

> (1) [T]o establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office; (2) to make it possible for Federal, State, and local governments to implement this subchapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office; (3) to protect the integrity of the electoral process; and (4) *to ensure that accurate and current voter registration rolls are maintained.*

42 U.S.C. § 1973gg(b) (emphasis added). Reading these purposes together, it is evident that the last identified purpose of the statute is dependent upon, and is the culmination of, the fulfillment of the other purposes of the statute. Those other purposes clearly point toward increasing voter registration and ensuring that the right to vote is not disrupted by illegal and improper impediments to registering to vote or to casting a vote. Accordingly, where those purposes are met, voter rolls may be deemed accurate and current. Undoubtedly, the goals of voter registration procedures are synonymous with the purposes of the statute. The court's conclusion regarding the Public Disclosure Provision's plain meaning is certainly congruent to the statute's purposes.

However, the defendants contend that making voter registration applications available to the public would discourage voter participation because it would involve a release of an applicant's personal and confidential information. Specifically, the defendants contend that disclosure of the applicant's social security number ("SSN"), the applicant's felony record, and whether the applicant has been declared mentally incompetent will keep persons from registering to vote, which is in direct conflict with the statute's purpose. The court disagrees. As a general matter, the statute identifies the information which Congress specifically wished to keep confidential, and sections of the statute require that the state inform applicants that such information will be kept confidential and used for limited purposes. *See id.* § 1973gg–3(D)(ii) and (iii) (requiring that voter registration application forms contain a statement that informs the voter that his declination to register and the agency through which he or she was registered will remain confidential and will be used only for voter registration purposes); *id.* § 1973gg–5(a)(7) (same); *id.* § 1973gg–6(a)(6) (same).

Similarly, the statute explicitly requires that other information related to voter registration, which to some persons may be considered sensitive, be disclosed to the public. *See* 42 U.S.C. § 1973gg–6(i)(2) (subjecting to disclosure lists including the "names and addresses" of persons to whom notices are sent regarding their removal from the voter rolls). There is no indication in the statute that entire voter registration applications should be kept confidential. Therefore, insofar as it appears, to some degree at least, Congress has already considered the effect on the statute's purposes of disclosing certain information to the public, as it relates to voter registration records, and keeping other information confidential, the court is not inclined to engage in an act of conjecture by concluding that the public disclosure of other information relating to voter registration would necessarily upset the purposes of the statute.[20]

---

**20.** The court finds the defendants' specific arguments regarding the potential public disclosure of a person's felony record or whether a person was previously adjudged incompetent, *see supra* at 710, unpersuasive. Such information would likely be a matter of public record, and, thus the potential for exposure

Nevertheless, the court does find that a person's SSN is precluded from disclosure, as disclosure of that information would undermine the purposes of the statute. In *Greidinger v. Davis*, 988 F.2d 1344 (4th Cir.1993), the Fourth Circuit considered whether Virginia's voter registration scheme, which required that an applicant supply his SSN to vote and which disclosed to the public voter registration applications bearing the applicant's SSN infringed on the applicant's right to vote. Namely, Virginia Code § 24.1–56, at that time, allowed any registered voter to review the voter registration books, which usually contained the registration application of a registered voter.[21] *Greidinger*, 988 F.2d at 1345. The plaintiff, whose application was rejected because of his refusal to provide his SSN, alleged that "to the extent Virginia authorizes the collection and publication of SSNs for voter registration, it unconstitutionally burdens his right to vote." *Id.* at 1346. The court held that "the Virginia statutes at issue, for all practical purposes, condition [the plaintiff's] right to vote on the public disclosure of his SSN." *Id.* at 1352. Also, after noting the potential abuses which could arise from public disclosure of one's SSN, the court held that the Virginia statutes created a substantial burden on the plaintiff's right to vote, and thus violated the Constitution. *Id.* at 1354.[22]

While *Greidinger* did not directly involve the NVRA, the court finds the Fourth Circuit's rationale regarding disclosure of a voter's SSN applicable to this case, and concludes that it would likely undermine the purposes of the statute for the NVRA to require that voters disclose their SSNs to the public.[23] As the Fourth Circuit recognized, SSNs are uniquely sen-

by way of a voter registration application is hardly a reason to limit the scope of the Public Disclosure Provision. Otherwise, there is no showing that disclosure of such information would create a substantial burden on the voter, to the degree that the voter would forego registering to vote. Therefore, there is no need to keep voter registration applications completely confidential, and, except to the extent the court specifically requires, the Public Disclosure Provision does not require that voter registration applications be redacted. *See infra* at 710–12.

21. The Virginia scheme also allowed voter registration applications containing SSNs to be disclosed to elected officeholders, candidates for public office, political parties, courts, and nonprofit organization promoting voter participation and registration, though for particular purposes. Va.Code § 24.1–23(8). Those disclosure statutes have been repealed.

22. Importantly, the court did not hold that the public disclosure of an applicant's voter registration application, in general, or a voter registration containing other potentially sensitive information violated the Constitution. In fact, the court specifically limited its holding as follows:

Most importantly, we note that Virginia's voter registration scheme imposes a substantial burden on [the plaintiff's] fundamental right to vote only to the extent that the scheme permits the public disclosure of his SSN. If the scheme provided for only the receipt and internal use of the SSN by Virginia, no substantial burden would exist. *Id.* at 1354 n. 10. Moreover, the court never suggested that Virginia must keep voter registration records confidential. Instead, the court suggested that Virginia eliminate the requirement that an applicant disclose his SSN or eliminate the use of SSN's on publicly available voter registration records. *Id.* at 1355. Notably, the district court's consent decree in *Greidinger*, following the Fourth Circuit's opinion, mandated that Virginia no longer make an applicant's SSN available for public disclosure, but it did not address whether voter applications themselves were subject to disclosure under the NVRA. *See Greidinger v. Davis*, No. 3:91CV00476 (E.D.Va. Aug. 30, 1993). This court sees no substantial burden if SSNs were either removed from the voter registration applications, or redacted from any voter registration applications made publicly available.

23. The court notes that the NVRA itself does not require disclosure of an applicant's SSN, nor is disclosure a prerequisite to the person's right to vote. Instead, the requirement that an applicant disclose his SSN is a standard imposed by Virginia.

sitive and vulnerable to abuse, such that a potential voter would understandably be hesitant to make such information available for public disclosure. For that reason, a SSN disclosure requirement potentially undermines the voter registration goals of the NVRA. Accordingly, the court finds that the NVRA does not require such disclosure, and any voter registration application containing an applicant's SSN should be redacted before public exposure of the application. The court finds such an interpretation consistent with existing precedent construing federal statutes that provide a right to information, excluding SSNs. *See, e.g., Greidinger*, 988 F.2d at 1354 (citing *I.B.E.W. Local No. 5 v. HUD*, 852 F.2d 87, 89 (3d Cir.1988) (holding that SSNs are exempt from disclosure under FOIA)); *see also* E–Government Act of 2002, Pub. L. No. 107–347, § 205(c), 116 Stat. 2899, 2914 (2002) (directing the federal courts to prevent the public disclosure of personal identifiers, such as SSNs, in filed court documents).[24]

### 4. Summary

The court concludes that 1) voter registration procedures are programs and activities which are "conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters;" and, 2) voter registration applications are records "concerning the implementation" of voter registration procedures. Having discerned the statute's plain meaning, the court need not consider the statute's legislative history. *See Willenbring v. United States*, 559 F.3d 225, 235 (4th Cir.2009) (holding that once the court discerns a statute's plain meaning, "this first canon is also the last [and] judicial inquiry is complete").[25] Accordingly, the court **DENIES** the defendant's Motion to Dismiss the Complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

### IV. Conclusion

The court **FINDS** that Project Vote has sufficiently alleged that it has suffered an informational injury due to the defendants' refusal to grant Project Vote access to the Requested Records. Accordingly, Project Vote has standing to bring the instant cause of action and the defendants' Motion to Dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(1) is **DENIED**. Moreover, the court **FINDS** that the National Voter Registration Act's Public Disclosure Provision, 42 U.S.C. § 1973gg–6(i)(1), grants Project Vote certain access to the Requested Records with, at least, the voters' SSNs redacted. Therefore, the defendant's Motion to Dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), is **DENIED**.

The court **DIRECTS** the Clerk to send a copy of this Opinion to counsel for the parties.

**IT IS SO ORDERED.**[26]

### INDEX

I. *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 698

24. The court's ruling is also consistent with the position taken by the Virginia Supreme Court as to a prior, but nearly identical, version of Virginia's public disclosure provision. *Rivera v. Long*, No. 070274 (Va. Feb. 8, 2008) (unpublished) (holding under Virginia Code § 24.2–444(A) that voter registration applications "must be made available ... after redaction of the Social Security numbers"); *see supra* note 3 for text of Virginia's current statute.

25. *See supra* note 11.

26. An index of this Opinion is attached for reference purposes and made a part hereof.

II. Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) ........................ 701
 A. General Standard of Review .......................................... 701
 B. Standing Analysis .................................................. 702

III. Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) ....................... 704
 A. General Standard of Review .......................................... 704
 B. Plain Meaning Analysis ............................................. 705
 1. Common and Ordinary Meaning .................................... 705
 2. Contextual Meaning ............................................. 708
 3. Statutory Purpose .............................................. 709
 4. Summary ........................................................ 712

IV. Conclusion ................................................................ 712